HELLRING LINDEMAN GOLDSTEIN
  & SIEGAL LLP
Stephen L. Dreyfuss, Esq.
Robert B. Rosen, Esq.
One Gateway Center
Newark, New Jersey 07102-5323
973.621.9020
sldreyfuss@hlgslaw.com
rbrosen@hlgslaw.com

VAL MANDEL, P.C.
Val Mandel, Esq.
Daniel Akselrod, Esq.
40 Exchange Place, Suite 1203
New York, New York 10005
212.668.1700
vm@valmandelpc.com
da@valmandelpc.com

Attorneys for Plaintiff D'Artagnan, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| D'ARTAGNAN, LLC,<br><br>              Plaintiff,<br><br>    vs.<br><br>SPRINKLR INC.,<br><br>              Defendant. | Civil Action No. 5437-cv-18<br><br><br><br><br><u>COMPLAINT</u> |

Plaintiff D'Artagnan, LLC ("D'Artagnan"), by its attorneys Hellring Lindeman

Goldstein & Siegal LLP and Val Mandel, P.C., for its complaint against defendant Sprinklr Inc.

("Sprinklr"), alleges as follows:

## <u>NATURE OF THE ACTION</u>

          1.      This action is brought to recover $160,055 paid to Sprinklr by

D'Artagnan, and for related relief.  Sprinklr obtained this payment as a result of its false

representations to D'Artagnan concerning the capabilities of a software program that Sprinklr sought to license to D'Artagnan. These misrepresentations led D'Artagnan to enter into an agreement to license the software from Sprinklr, notwithstanding the fact that D'Artagnan and Sprinklr never reached a meeting of the minds as to what the software program could provide and what it would do for D'Artagnan. Sprinklr's conduct caused D'Artagnan damages under New Jersey's Consumer Fraud Act and New York and New Jersey common law.

## JURISDICTION AND VENUE

2.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1332, since there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

3.      The Court has personal jurisdiction over Sprinklr, and venue is proper in this District pursuant to 28 U.S.C. §§1391(b)(1) and (c)(2), because Sprinklr resides within the Southern District of New York.

## THE PARTIES AND RELEVANT FACTS

4.      D'Artagnan is a New Jersey limited liability company with its principal place of business at 600 Green Lane, Union, New Jersey.

5.      Upon information and belief, Sprinklr is a Delaware corporation with its principal place of business at 29 West 35th Street, New York, New York.

6.      D'Artagnan is a leading purveyor of meats, foie gras, patés, sausages, mushrooms, organic game and poultry in the United States that provides more than 900 products to the country's top restaurants, hotels, cruise ships, airlines and distributors and retailers of fancy foods.

7.      Sprinklr provides social media management services to its clients. According to its website, "Sprinklr is the most complete social media management system for

the enterprise [that helps] the world's largest brands do marketing, advertising, care, sales, research, and commerce on Facebook, Twitter, LinkedIn, and 21 other channels globally--all on one integrated platform."  Through a licensed integrated software platform, Sprinklr purports to help businesses create, manage, reach and optimize digital and online experiences for their customers across social media channels.

        8.     D'Artagnan was introduced to Sprinklr in early 2017.  Sprinklr held itself out to D'Artagnan as having special expertise to advise D'Artagnan and enable D'Artagnan to expand its marketing on social media platforms.  Sprinklr specifically offered to provide a licensed software platform that would, among other things, enable D'Artagnan to monitor social media sites and target its advertising to persons who have expressed on those sites an interest in D'Artagnan or products sold by D'Artagnan, and chefs and others who prepare and enjoy products similar to those sold by D'Artagnan.  As an example, according to Sprinklr its social listening platform would permit anyone using keywords, names or handles that include the words "private chef" to be identified and sent advertisements for D'Artagnan's products.  Similarly, according to Sprinklr, anyone mentioning foie gras or paté on any social media channel could be identified and targeted for direct advertising.

        9.     From the beginning of its discussions with Sprinklr, D'Artagnan made clear that it was not seeking to create a general public relations and branding initiative.  Rather, D'Artagnan wanted a tool that would enable it to perform direct targeting (known as "one-to-one" or "1x1") through social media channels, particularly Facebook and Instagram, frequently used by customers and potential customers for D'Artagnan's products.   D'Artagnan repeatedly emphasized to Sprinklr that as a niche company with small gross margins and modest levels of available discretionary spending, it was imperative for D'Artagnan that this tool permit it to

target customers efficiently on a one-to-one basis rather than merely building databases based on profiled "look-alike" consumers.

10.     In response, Sprinklr told D'Artagnan that by using Sprinklr's licensed platform, D'Artagnan could create, track and measure the return on its investment in its social media campaigns.  In addition, Sprinklr represented that the licensed program could enable D'Artagnan to identify specific consumers on social media via listening platforms developed by Sprinklr, and then to build target audiences and directly market to specific customers on a one-to-one ("1x1") basis.  D'Artagnan relied on those representations, and on Sprinklr's unique skills, advice and expertise, as the basis for placing its confidence and trust in Sprinklr.

11.     D'Artagnan and Sprinklr representatives held meetings at D'Artagnan's New Jersey headquarters to review D'Artagnan's requirements and what Sprinklr's proposed software and platform could provide.  During those meetings and in other communications in March, April and May of 2017, Sprinklr reiterated that its licensed platform could directly target its advertisements to customers who had expressed interest in the types of food sold by D'Artagnan.  At those meetings, D'Artagnan stressed the importance of having a tool that would support the business of D'Artagnan's three divisions:  (1) eCommerce -- direct sales and customer acquisition; (2) retail -- targeted campaigns to drive customers to retail stores at which D'Artagnan's products are sold; and (3) food service -- targeted campaigns to drive consumers to restaurants that use D'Artagnan products.  D'Artagnan also confirmed to Sprinklr the importance of regional targeting and of achieving 1x1 targeted marketing through Facebook, Instagram, Twitter and LinkedIn to specific consumers who had expressed on social media channels interest in, for example, foie gras, pig roasts or private chefs, or who had "liked" other consumers' posts reflecting similar interests.

12.     During these meetings and communications, Sprinklr told D'Artagnan that, in addition to "look-alike" audiences, specific consumers could be collected in "buckets," as determined through social listening of their posts or other communications on all forms of social media, and those bucketed consumers could be served with advertisements by D'Artagnan.  This aspect of Sprinklr's purported capabilities was critical to D'Artagnan because it would enable D'Artagnan to reach customers that it otherwise would not be able to reach directly.  Sprinklr reiterated this purported capability to D'Artagnan repeatedly and consistently in several conversations from March through May 2017, including directly to D'Artagnan's President in response to his requests for assurances that Sprinklr's platform could provide the 1x1 customer targeting D'Artagnan sought.

13.     In a May 2017 proposal that updated an earlier proposal, Sprinklr expressly summarized its capabilities for D'Artagnan:



What We're Solving For:

· Giving D'Artagnan the competitive advantage to take market share for the next 5+ years and expand the retail and food services footprint across the US

· Follow the customer journey and influence it with targeted content throughout the buying process and the customer life cycle

· Tagging custom audiences based on location, type of customer, interests gleaned from social for better engagement, higher return on ad spend, and increased lifetime value

· Listening to trends and what's happening on social, in specific locations, will help drive retail awareness, sales pipeline, and trend-spotting ahead of competitors

· Live reporting on paid-ad campaigns will dramatically improve ROAS

· Linking Customer Service data and Ratings & Reviews to social media strategy will enhance the customer buying journey, create D'Artagnan evangelists, and increase customer lifetime value





14.    Based on Sprinklr's promises and representations, on or about June 2, 2017 D'Artagnan entered into a License, a Master Services Agreement and a Statement of Work ("SOW") (collectively, the "Contract").  On or about July 6, 2017, D'Artagnan paid Sprinklr, in advance, $168,215.  (A subsequent refund for an unordered service reduced D'Artagnan's net payment to $160,055.)  The License, Master Services Agreement and SOW outlined the services Sprinklr would provide and described the functions of the licensed platform.  Nothing in the License, Master Services Agreement or SOW contradicted the prior representations made by Sprinklr's representatives or indicated that 1x1 targeted advertising was not possible on Facebook or Instagram.

15.    Notwithstanding Sprinklr's contrary representations, in or about August 2017 and before D'Artagnan began using Sprinklr's services or the licensed platform, D'Artagnan discovered that Sprinklr's licensed software did not permit it to target its advertising on Facebook or Instagram directly to the customers collected in the buckets generated by the listening platform.  Although D'Artagnan could target 1x1 on Twitter through Sprinklr's

platform, on Facebook and Instagram (D'Artagnan's priority social media channels) D'Artagnan could only create look-alike audiences and target its advertisements to the look-alikes.

16.     Sprinklr subsequently conceded that its sales representatives had miscommunicated its Facebook and Instagram capabilities to D'Artagnan.  However, Sprinklr refused to modify the Contract or provide D'Artagnan with the missing capabilities for which it had contracted.

17.     To this day, D'Artagnan has not made external use of Sprinklr's services or any of the licensed software for which it paid $160,055.

## COUNT I

### (NEW JERSEY CONSUMER FRAUD ACT, N.J.S.A. 56:8-1 et seq.)

18.     D'Artagnan repeats and realleges the allegations contained in paragraphs 1 through 17 as if fully set forth herein.

19.     Sprinklr used unconscionable commercial practices, deception, false promises and/or misrepresentations in connection with its offering of its software platform and services for sale and/or license to D'Artagnan.

20.     Sprinklr knowingly concealed, suppressed and omitted material facts in connection with its promotion of its software and its capabilities with the intent that D'Artagnan rely thereon.

21.     Sprinklr violated New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-1, et seq., by fraudulently misrepresenting to D'Artagnan in New Jersey the capabilities of its software platform.

22.     Sprinklr made its misrepresentations to D'Artagnan knowing them to be materially false and inaccurate.

7

23.     D'Artagnan relied on Sprinklr's misrepresentations when it entered into the Contract to license Sprinklr's software platform.

24.     D'Artagnan has suffered losses as a result of Sprinklr's conduct.

25.     Sprinklr's conduct was wanton, willful and in outrageous disregard of D'Artagnan's rights.

## COUNT II

### (FRAUD)

26.     D'Artagnan repeats and realleges the allegations of paragraphs 1 through 25 as if fully set forth herein.

27.     Sprinklr knowingly and intentionally misrepresented the capabilities of its platform and led D'Artagnan to believe that Sprinklr's licensed platform could enable D'Artagnan to identify specific customers on Facebook and Instagram by collecting them in buckets and then targeting those collected customers with advertisements on a 1x1 basis.

28.     Sprinklr's statements were false when made, and were made for the purpose of inducing D'Artagnan to enter into the Contract.

29.     D'Artagnan reasonably relied on the representations made by Sprinklr.

30.     Sprinklr's misrepresentations omissions were made with malicious intent, and resulted in significant injury and damage to D'Artagnan in an amount to be determined at trial.

## COUNT III

### (NEGLIGENT MISREPRESENTATION)

31.     D'Artagnan repeats and realleges the allegations of paragraphs 1 through 30 as if fully set forth herein.

32.    Sprinklr held itself out to D'Artagnan as having special expertise to advice D'Artagnan in the field of social media marketing, and owed a duty to D'Artagnan to provide accurate information.

33.    Sprinklr misrepresented the capabilities of its platform by telling D'Artagnan that, on Facebook and Instagram, Sprinklr's licensed platform could enable D'Artagnan to identify specific customers by collecting them in buckets and then targeting those collected customers with advertisements on a 1x1 basis, when Sprinklr knew or should have known that its licensed platform did not have that capability on Facebook or Instagram.

34.    Sprinklr knew that D'Artagnan wanted the ability to target specific customers on Facebook and Instagram on a 1x1 basis and that, absent Sprinklr's representations, D'Artagnan would not have engaged Sprinklr's services or licensed its software.

35.    D'Artagnan relied on Sprinklr's expertise and representations concerning the ability of its software to enable D'Artagnan to target specific customers on Facebook and Instagram.

36.    Sprinklr's misrepresentations were negligent and resulted from its lack of due care and diligence.

37.    Sprinklr's acts and omissions, including its failure to correct its misrepresentations, caused D'Artagnan significant injury and damage in an amount to be determined at trial.

## COUNT IV

### (DECLARATORY RELIEF)

38.    D'Artagnan repeats and realleges the allegations contained in paragraphs 1 through 37 as if fully set forth herein.

39.     Based on Sprinklr's representations, D'Artagnan reasonably understood and believed that the Sprinklr software it was leasing would enable it to target its advertisements on Facebook and Instagram directly to specific customers identified through Sprinklr's listening platform and collected in buckets using Sprinklr's software.

40.     Since Sprinklr well knew that Sprinklr's software was not and never had been able to target advertisements directly to specific consumers on Facebook and Instagram, D'Artagnan and Sprinklr did not reach a meeting of the minds as to the nature and essential terms of the agreement they were entering into for the supply of software, and the capabilities of that software.

41.     For the foregoing reasons, the Court should declare that no agreement was entered into between D'Artagnan and Sprinklr because there was no meeting of the minds as to the material terms of the agreement, and should direct Sprinklr to return to D'Artagnan all money paid by D'Artagnan to Sprinklr under the Contract.

## COUNT V

### (BREACH OF CONTRACT)

42.     D'Artagnan repeats and realleges the allegations contained in paragraphs 1 through 41 as if fully set forth herein.

43.     Sprinklr's failure to provide D'Artagnan with the ability to target specific customers and direct advertisements to these particular customers on Facebook and Instagram constitutes a breach of its Contract with D'Artagnan.

44.     D'Artagnan has performed all of its obligations under the Contract with Sprinklr.

45.     As a result of the foregoing, D'Artagnan has suffered damages in an amount not less than $160,055.

## COUNT VI

### (UNJUST ENRICHMENT)

46.    D'Artagnan repeats and realleges the allegations contained in paragraphs 1 through 45 as if fully set forth herein.

47.    D'Artagnan paid Sprinklr $160,055 in reliance upon the false and fraudulent information supplied by Sprinklr concerning the capabilities of its licensed platform.

48.    Sprinklr profited from its misconduct.

49.    If Sprinkler were permitted to retain the money paid to it by D'Artagnan, Sprinklr would be unjustly enriched.

WHEREFORE D'Artagnan demands judgment against Sprinklr as follows:

1.    On the First Cause of Action, for compensatory damages to be determined by the Court; treble damages; reasonable costs and expenses, including attorneys fees, filing fees and costs of suit; interest; and for such other and further relief as the Court may deem just and proper;

2.    On the Second Cause of Action, for compensatory damages to be determined by the Court; punitive damages; attorneys fees, filing fees and costs of suit; interest; and for such other and further relief as the Court may deem just and proper.

3.    On the Third Cause of Action, for compensatory damages to be determined by the Court and interest, and for such other and further relief as the Court may deem just and proper.

4.    On the Fourth Cause of Action, for a declaration that no agreement was entered into between D'Artagnan and Sprinklr because there was no meeting of the minds as to the material terms of the agreement, and direction to Sprinklr to return to D'Artagnan all money paid

by D'Artagnan to Sprinklr, and for such other and further relief as the Court may deem just and proper.

5.      On the Fifth Cause of Action, for compensatory damages to be determined by the Court and interest, and for such other and further relief as the Court may deem just and proper.

6.      On the Sixth Cause of Action, for compensatory damages to be determined by the Court; punitive damages; attorneys fees, filing fees and costs of suit; interest; and for such other and further relief as the Court may deem just and proper.

7.      For such other and further relief as to the Court shall seem proper, together with the costs of this action.


VAL MANDEL P.C.


By:   */s/ Daniel Akselrod*
        Daniel Akselrod, Esq.
        40 Exchange Place, Suite 1203
        New York, New York 10005
        212.668.1700
        *Attorneys for Plaintiff*
        da@valmandelpc.com

Of counsel:

Stephen L. Dreyfuss, Esq.
Robert B. Rosen, Esq.
HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP
One Gateway Center - 8th Floor
Newark, New Jersey 07102
973.621.9020
sldreyfuss@hlgslaw.com
rbrosen@hlgslaw.com

181277